UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

PATRICIA RASMUSSEN CATALANO,

        Plaintiff,

- against -

CLEARSTREAM BANKING, S.A.,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

07 Civ. 

COMPLAINT

PLAINTIFF DEMANDS
A TRIAL BY JURY

        Plaintiff Patricia Rasmussen Catalano ("Catalano" or "plaintiff"), through her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complains of defendant Clearstream Banking, S.A. ("Clearstream" or "defendant") as follows:

### NATURE OF THE ACTION

        1.    Plaintiff brings this action to remedy sex and pregnancy discrimination in employment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); the New York State Executive Law § 290 et seq. (the "Executive Law"); and the Administrative Code of the City of New York § 8-101 et seq. ("City Law").

        2.    Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages, and other appropriate legal and equitable relief pursuant to Title VII, the Executive Law, and the City Law.

### JURISDICTION AND VENUE

        3.    This Court has jurisdiction pursuant to § 706(f)(3) of Title VII, 42 U.S.C. § 2000e § 5(f)(3). Pursuant to 28 U.S.C. §§ 1332 and 1367, the Court has diversity and supplemental jurisdiction over plaintiff's claims brought under the Executive Law and the City Law.

247275 v1

4. Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission (the "EEOC") on or about January 4, 2007, complaining of the acts of sex and pregnancy discrimination alleged herein. On or about July 30, 2007, the EEOC issued plaintiff a notice informing her of her right to sue defendant in federal court. Plaintiff has thus complied fully with all prerequisites required by Title VII.

5. Pursuant to § 8-502(c) of the City Law, prior to filing this Complaint, plaintiff served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Southern District of New York and defendant regularly does business within the Southern District of New York.

## PARTIES

7. Plaintiff is a woman who worked for defendant and its predecessor from 1992 until September 20, 2006, when defendant terminated her employment soon after she returned from her maternity leave. Plaintiff is a citizen of New York, and her damages exceed $75,000.

8. Defendant is an International Central Securities Depository. Upon information and belief, Clearstream is a citizen of Luxembourg and Germany. Clearstream is an employer within the meaning of Title VII, the Executive Law and the City Law.

## FACTS

9. In or about April 1992, Clearstream's predecessor, Cedel International ("Cedel"), hired Catalano as a Vice President and Business Development Manager, Americas Region in its New York office.

10. In 2000, Cedel merged with a subsidiary of Deutsche Borse, A.G. ("Deutsche Borse") and the name was changed to Clearstream. Deutsche Borse purchased the other fifty percent of Clearstream in 2002.

11. Throughout Catalano's employment with defendant she was given positive reviews, solid bonuses, and periodic raises.

12. By 1995, Catalano held the position Marketing Manager of the Americas Region, with the title of Vice President.

13. The duties Clearstream assigned to Catalano went well beyond those normally performed in a marketing position, including compliance, office administration and physical property. For example, in 1998 Catalano was one of two employees who identified and successfully stopped a $6.25 billion fraud attempt on defendant, which resulted in a cash reward and a commendation from the Chief Executive Officer. Catalano was also one of the staff members given responsibility for reassembling Clearstream's World Trade Center-based offices after the 1993 and 2001 terrorist attacks. Catalano was also assigned administrative and regulatory responsibilities on the projects to open, and subsequently to close, the Clearstream Mexico City and Sao Paulo offices.

14. In late 1995, Clearstream hired Michael Barrett ("Barrett") to be Manager, and in early 1996 Anthony Masiello ("Masiello") to be Deputy Manager, of the New York office.

15. Barrett remained with Clearstream until he left to work for another financial institution in or about April 2001.

16.     During the 1995 to 2001 time period that Barrett was Manager of Clearstream's New York office, he engaged in a pattern and practice of discriminating against women. For example:

    a.     Upon information and belief, when Barrett and Masiello were first hired they discussed "going after" Catalano, who was single at the time, and another single female employee.

    b.     Barrett spent far more time with male employees than female employees, cultivating close relationships with the male employees. Barrett invited male employees to frequent social events outside the office, but did not invite plaintiff or other female employees.

    c.     Barrett disclosed confidential information about Catalano's fertility treatments after she married in 1997, as well as about a pregnancy that resulted in a miscarriage in 1998. Barrett made disparaging comments about Catalano's pregnancy and miscarriage.

    d.     In 1997, Barrett asked Catalano to assume, in addition to all her other duties, the Customer Service Manager of the Americas function for the New York office, as Catalano had previously worked as a Customer Service Manager at two other international financial organizations. The job included managing approximately seven staff members and responses to all queries received from customers in the region. After considering the increased workload and responsibility level, Catalano told Barrett she was willing assume the Customer Service Manager responsibility, in addition to all her other duties, if her base salary was increased. Barrett immediately declined and told Catalano he wanted

her to assume the increased responsibility without any increase in salary. As a result, Catalano was compelled to decline. Shortly thereafter, Barrett hired a new male employee, Tom Hopkins ("Hopkins"), as the Customer Service Manager of the Americas.

e. In 1999, Barrett tried to force Catalano to undertake a sales project, although sales had never been one of Catalano's responsibilities, and despite Barrett knowing that Catalano could not travel extensively due to fertility treatments. When Catalano told Barrett she could not undertake this new project because of the medical issue of which he was aware, Barrett shouted at Catalano, called her "disabled" and threatened to force her onto disability leave and hire a salesperson to replace her. The next day Barrett apologized for his outburst.

f. Barrett repeatedly made comments that Catalano and another female employee did not need to be paid more money because Catalano was married and the other woman lived with her boyfriend. Upon information and belief, Barrett's attitude affected compensation decisions he made concerning Catalano and the other female employee.

g. Upon information and belief, Barrett repeatedly engaged in sexually inappropriate conduct toward women in Clearstream's office, including making sexual comments and gestures and engaging in unwelcome physical contact.

17. After Barrett left Clearstream in 2001, Masiello became Manager of the New York office.

18.  After Barrett left Clearstream, Catalano commented to Masiello on several occasions that Barrett did not treat employees equally. She also told Masiello that she had heard that the firm where Barrett was then employed had forced him to undergo sensitivity training because of two incidents he had with women there. Masiello did not respond to Catalano's statements. When other people in the office commented on Barrett's inappropriate behavior toward women and the need for sensitivity training, Masiello did not respond.

19.  In 2003, Clearstream eliminated job descriptions for all of its employees and changed its internal senior level titles to "Expert," "Senior Expert," and "Director." Catalano was given the internal title of "Expert" with an external title of Key Relationship Manager, with no job description. As a result of a requirement to pass a 2004 Federal Reserve Bank of New York regulatory audit, Clearstream senior management asked Catalano to write job descriptions for everyone in the New York Office. She did so. After the 2004 audit, Clearstream's Chief Executive Officer received an Audit Letter from the Federal Reserve Bank of New York, which included a commendation of Catalano for her performance during the audit. Catalano's bonus for 2004 was increased in part because of this commendation.

20.  After Barrett left Clearstream, Catalano received much higher raises and bonuses, and received a series of "special" bonuses that she did not receive when Barrett worked at Clearstream. In fact, Catalano's 2005 bonus, which she received in January 2006, was the largest she had ever received. Masiello told Catalano that her bonus one of the larger bonuses awarded in the New York Office that year. Masiello also told Catalano that he and Tom Zeeb ("Zeeb"), Masiello's manager, who was hired in 2004 as Director of Customer Relations for the United Kingdom, Scandinavia and the United States, very much appreciated all of Catalano's hard work and that she was one of the best workers in the office.

21. In October 2005, Catalano told Masiello that she was pregnant. The next day, Masiello told Catalano that he had informed Zeeb that she was pregnant. Thereafter, Catalano had subsequent meetings, conversations and emails with Masiello and Zeeb regarding her pregnancy.

22. In January 2006, Zeeb, who had recently been promoted to the position of Head of Customer Relations for Europe and the Americas, and Masiello announced that Clearstream had rehired Barrett as Director of the Americas Region and Manager of the New York Office, reporting to Zeeb. Masiello strongly supported Barrett's return to Clearstream and aided his interview process with Clearstream management during the fall and winter of 2005.

23. Catalano became very concerned when she learned that Barrett was returning to Clearstream as her manager, as she was almost eight months pregnant at the time of the announcement. In or about February 2006, in response to a question Zeeb posed to Catalano about what she thought about Barrett's returning to the New York office, Catalano told Zeeb that although Barrett was a good sales person, he had a number of issues as a manager. Before Catalano could convey to Zeeb the problems she had with Barrett, including his history of discriminatory behavior, Zeeb cut her off.

24. Barrett returned to Clearstream on or about March 7, 2006. At that time Catalano was nine months pregnant. During the first week following Barrett's return to Clearstream, Catalano had a conference call with Barrett and another staff member overseas. Barrett introduced Catalano on the conference call by saying, "Here's Pat, who's looking like a whale."

25. Following his return to Clearstream, Barrett continued to spend time and socialize almost exclusively with the men in the office.

26. Catalano's last day of work before taking maternity leave was March 24, 2006. Catalano left the office that morning to go directly to the hospital to give birth. Catalano was on maternity leave from March 27, 2006 through July 10, 2006. Catalano went into the office one day during her leave to work, and also assisted several colleagues during her leave to help them with various tasks that were normally part of her job.

27. When Catalano called Barrett during her maternity leave, he did not return her calls.

28. Catalano returned to work on July 10, 2006. She met with Barrett that afternoon, as soon as he came into the office. Barrett told Catalano that he discussed with Zeeb the possibility that Catalano might not want to return to work after her maternity leave – an idea Catalano had never suggested to him. Barrett told Catalano that he thought it was important to put family first and that no other employee had done more for the company than Catalano and the company wanted to support her. Barrett told Catalano that she could take a year or two leave of absence, work from home, or work for the company on a consulting basis. Catalano told Barrett that she was not interested in taking more time off, but was interested in his offer of working from home, full time or part time, only if she could remain a permanent staff member with full benefits so she could return to working in the office full time as soon as her baby was a little older. Barrett told Catalano that it was fine with him if she began working from home full time, starting the next day. Catalano said that if these conditions were not acceptable to the company to please let her know so they could end that arrangement, as she was ready to return to work full time in the office. Catalano told Barrett that even if she did work from home, she would still perform the administrative and other duties associated with her job and come into the office as needed. Instead, Barrett told Catalano that Hopkins, who had recently been rehired, would take over Catalano's administrative

and other non-marketing responsibilities, because Barrett wanted her to focus on two recently assigned marketing projects, as Catalano was "really great at that" and that was where he "really needs [her] help." Barrett instructed Catalano to "just focus on those and don't worry about the other things."

29. Catalano accepted Barrett's offer to temporarily work from home full time beginning on July 11, 2006. She began work on Barrett's first marketing project. Catalano was told by Barrett and the other senior manager assigned to the project that her work on the project was very good. During the course of the project, it became clear that other staff members based in the head office working on the project with Catalano would be unable to complete their assigned portion on time. Catalano volunteered to perform the majority of their assigned work to ensure that the project would be completed on time. Barrett agreed that she should do this and she did.

30. On September 20, 2006, Catalano received a call from Barrett, who announced, "I don't have good news for you. Are you ready?" Barrett then told Catalano that Clearstream was firing her. Barrett said that her last day with Clearstream would be September 30, 2006. After he fired Catalano, Barrett told her, "This may be good news for you."

31. Upon information and belief, Clearstream has told individuals in its small, close-knit industry that Catalano voluntarily left the company because she had a baby.

32. Upon information and belief, Hopkins continues to handle Catalano's former non-marketing responsibilities.

33. Upon information and belief, after firing Catalano, defendants hired a man to be a Customer Service Officer in Clearstream's New York office, and filled another officer-

level position shortly thereafter. Upon information and belief, both positions are at a level that is comparable to the position that Catalano held before she was fired.

## FIRST CAUSE OF ACTION

(Title VII - Discrimination)

34. Plaintiff repeats and realleges paragraphs 1 through 33 of this Complaint as if fully set forth herein.

35. Defendant discriminated against plaintiff in the terms and conditions of her employment based on her gender and/or pregnancy in violation of Title VII.

36. Defendant acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

37. As a result of defendant's discriminatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

## SECOND CAUSE OF ACTION

(Executive Law – Discrimination)

38. Plaintiff repeats and realleges paragraphs 1 through 37 of this Complaint as if fully set forth herein.

39. Defendant discriminated against plaintiff in the terms and conditions of her employment based on her gender and/or pregnancy in violation of the Executive Law.

40. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation and other compensable damages.

## THIRD CAUSE OF ACTION

(City Law – Discrimination)

41. Plaintiff repeats and realleges paragraphs 1 through 40 of this Complaint as if fully set forth herein.

42. Defendant discriminated against plaintiff in the terms and conditions of her employment based on her gender and/or pregnancy, in violation of City Law.

43. Defendant knew that their actions constituted unlawful discrimination on the basis of plaintiff's gender and/or pregnancy and/or showed reckless disregard for plaintiff's statutorily protected rights.

44. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation and other compensable damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

(a) declaring that the acts and practices complained of herein are in violation of Title VII, the Executive Law and the City Law;

(b) preliminarily and permanently enjoining and restraining these violations of Title VII, the Executive Law and the City Law;

(c) directing defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d) directing defendant to place plaintiff in the position she would have continued to occupy but for defendant's discriminatory treatment of her, and make her whole for all

247275 v1                                11

earnings she would have received but for defendant's conduct, including, but not limited to, wages, bonuses, health care benefits, paid time off, pension, and other lost benefits;

(e)  directing defendant to pay plaintiff compensatory damages for her mental anguish and humiliation;

(f)  directing defendant to pay plaintiff punitive damages for its intentional disregard of and/or reckless indifference to plaintiff's rights;

(g)  awarding plaintiff interest and the costs of this action together with reasonable attorneys' fees;

(h)  awarding plaintiff damages for any adverse tax consequences; and

(i)  awarding such other and further relief as this Court may deem necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
       September 14, 2007

                                      VLADECK, WALDMAN, ELIAS
                                          &ENGELHARD, P.C.

By: _____
Anne L. Clark (AC 6456)
Rebecca J. Osborne (RO 9916)
Attorneys for Plaintiff
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7300

247275 v1

12